FILED
2026 Aug-10 PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| **MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 2:25-cv-00659-MHH** |
| **MOBILE FLEET SPECIALISTS OF BIRMINGHAM, INC.; *et al.*** | ) | |
| **Defendants.** | ) | |

**DEFENDANT MOBILE FLEET SPECIALISTS OF BIRMINGHAM'S RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Mobile Fleet Specialists of Birmingham, Inc. ("Mobile Fleet") and files this response to Plaintiff Mesa Underwriters Specialty Insurance Company's ("MUSIC") Motion for Summary Judgment ("MUSIC MSJ") [Doc. 32]. MUSIC is not entitled to summary judgment because its declaratory judgment claim does not address the operative complaint in the underlying tort action. Even if it did, that complaint and the admissible evidence independently support coverage under the Policy's[1] "garage operations" provision. MUSIC offers no evidence that the subject property's omission from the insurance application was material, while the

[1] Adopting MUSIC's definition. *See* MUSIC MSJ [Doc. 32] at 4.

evidence shows that MUSIC's general agent received sufficient pre-accident notice to require further inquiry. At a minimum, those issues preclude MUSIC from getting summary judgment on its duty to defend, and the Court should decline to address MUSIC's duty to indemnify while the underlying tort action remains pending.

## I. <u>MOBILE FLEET'S RESPONSE TO MUSIC'S STATEMENT OF UNDISPUTED FACTS</u>

1. Admitted.

2. Admitted.

3. Mobile Fleet admits that Jeff Osborn ("Mr. Osborn") responded to questions on the Garage Application but denies MUSIC's characterization that those questions "[sought] material information" because the cited portion of the application does not use that term. *See* MUSIC Ex. B [Doc. 32-1] at 1.

4. Admitted.

5. Admitted.

6. Admitted, though the Policy was later changed to add additional insureds, including MAR Properties. *See* MUSIC Ex. C [Doc. 32-3] at 73.

7. Partially denied: the two locations are identified, but the premium amounts are redacted. *See* MUSIC Ex. C [Doc. 32-3] at 10.

8. Admitted.

9. Admitted.

10. Admitted.

13.[2] Admitted.

14. Admitted.

15. Admitted. MUSIC sought a declaratory judgment that it had no duty to defend or indemnify Mobile Fleet in the underlying tort action, and it "[a]ttached . . . as Exhibit 1 [a] true and correct copy of the ***operative*** 'Consolidated Complaint' filed in the Underlying Action[], which is fully incorporated herein by reference." Complaint [Doc. 1] at ¶ 26 (emphasis added); *see also* Complaint Ex. 1 [Doc. 1-1].

16. Admitted.

17. Admitted.

18. Partially denied: the wording makes it unclear whether Mobile Fleet was allegedly "supervising the work" or whether that allegation was being made against Jon's Tree Service. *See* MUSIC Ex. F [Doc. 32-6] at ¶ 8.

---

2 The MUSIC MSJ skips paragraphs 11 and 12. *See* MUSIC MSJ [Doc. 32] at 6.

19. Admitted, though MUSIC omits the part of the allegation that states Mobile Fleet was "operating its heavy truck repair business" at the location. *See* MUSIC Ex. F [Doc. 32-6] at ¶ 9.

20. Admitted.

21. Admitted.

22. Admitted.

23. Admitted.

24. Mobile Fleet admits that this statement appeared in the cited interrogatory response, but Mobile Fleet's two owners later testified in their depositions that Mobile Fleet was operating at 3100 9TH Avenue North in Birmingham (the "Property") and using it for Mobile Fleet's "garage operations" before Mr. Westmoreland's accident. Mobile Fleet Ex. 9 [Doc. 34-1] at 69:6 – 71:18; 106:2 – 109:1; 112:15 – 113:9; 114:16 – 115:13; 168:17 – 169:14; Mobile Fleet Ex. 23 [Doc. 34-15] at 30:4-8, 41:13 – 42:6.[3]

## II. MOBILE FLEET'S STATEMENT OF UNDISPUTED FACTS

### A. Mobile Fleet's Operations and Insurance History

1. Mobile Fleet performs truck repair services and provides parts for medium and heavy-duty trucks and larger vehicles like buses. Mobile

[3] If citing a deposition, Mobile Fleet will cite to the page and line numbers of the deposition. If citing an exhibit containing Bates-numbered pages, Mobile Fleet will cite the Bates-number.

Fleet Ex. 10 [Doc. 34-2] at ¶ 3. Mobile Fleet's service vehicles are dispatched to various locations and are specially designed and equipped to complete on-site service and repairs. *Id.*

2. Greenhalgh Insurance Agency ("Greenhalgh") is an insurance agency that represented Mobile Fleet during the events at issue, including the events that occurred before and during the Policy's term. Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 4; Mobile Fleet Ex. 11 [Doc. 34-3] at ¶¶ 2-3.

3. The Policy identifies Amwins Access Insurance Services ("Amwins") as MUSIC's "General Agent." MUSIC Ex. C [Doc. 32-3] at 1. The Policy also identifies Amwins as the surplus lines broker. *Id.* at 2.

4. On January 7, 2022, Mobile Fleet agreed to lease the Property from MAR Properties (the "Property Lease"). MUSIC Ex. A [Doc. 32-1] at 1. The Property Lease stated the Property would be used for Mobile Fleet's "Fleet Management Shop[.]" *Id.*

5. At all times after January 7, 2022, including all times before Mr. Westmoreland's accident, the Property was the only property that Mobile Fleet leased from MAR Properties. Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 7; Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 6. Mobile Fleet did not lease any other property from MAR Properties, and MAR Properties was not the lessor or owner of any other property where Mobile Fleet conducted its

business. Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 7; Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 6.

6. Century Surety Company ("Century Surety") insured Mobile Fleet when it signed the Property Lease. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 7. On February 17, 2022, Greenhalgh requested that the Property be added to the Century Surety policy. Mobile Fleet Ex. 12 [Doc. 34-4]. Century Surety added the Property to Mobile Fleet's "garage coverage" effective February 17, 2022. Mobile Fleet Ex. 13 [Doc. 34-5] at 000024.

7. On May 2, 2022, Century Surety sent notification that it would not renew Mobile Fleet's policy and that the policy would end on June 30, 2022. Mobile Fleet Ex. 14 [Doc. 34-6] at 000030.

8. To obtain replacement coverage to go into effect when the Century Surety policy expired, Greenhalgh sent Mr. Osborn a blank Amwins "Garage Application." Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 8; Mobile Fleet Ex. 15 [Doc. 34-7] at 000049 – 000058. To assist Mr. Osborn, Greenhalgh also sent the Amwins "Garage Application" form "[Mobile Fleet] completed [in 2021] for reference." Mobile Fleet Ex. 15 [Doc. 34-7] at 000049, 000062 – 000069.

9. Remco Hoytink ("Mr. Hoytink"), Mr. Osborn's business partner, had completed Mobile Fleet's 2021 Amwins "Garage Application"

(the "2021 Garage Application"). Mobile Fleet Ex. 10 [Doc. 34-2] at ¶¶ 15-16; Mobile Fleet Ex. 15 [Doc. 34-7] at 000062 – 000069. The 2021 Garage Application did not include the Property because it was completed before the Property Lease. MUSIC Ex. A [Doc. 32-1] at 1; Mobile Fleet Ex. 10 [Doc. 34-2] at ¶¶ 15-16; Mobile Fleet Ex. 15 [Doc. 34-7] at 000062 – 000069.

10. On or about May 13, 2022, Mr. Osborn completed the Amwins "Garage Application" (the "2022 Garage Application") using the 2021 Garage Application as a reference. MUSIC Ex. B [Doc. 32-2]; Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 16. Mr. Osborn did not include the Property in the "Locations" section of the 2022 Garage Application. MUSIC Ex. B [Doc. 32-2] at 1. He testified that the omission was inadvertent and resulted from his use of the 2021 Garage Application—which predated the Property Lease—as a reference. Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 16; Mobile Fleet Ex. 15 [Doc. 34-7] at 000062 – 000069.

11. On June 23, 2022, during communications with Amwins concerning an endorsement to Mobile Fleet's existing Century Surety policy, Greenhalgh sent Amwins the Property Lease. Mobile Fleet Ex. 16 [Doc. 34-8] at 000178, 000189 – 000208.

12. MUSIC issued the Policy for the period of June 30, 2022, through June 30, 2023. MUSIC Ex. C [Doc. 32-3] at 2.

13. On July 6, 2022, Greenhalgh sent Amwins certificates identifying changes that needed to be made to the Policy, including additional-insured, waiver-of-subrogation, and notice endorsements that Greenhalgh requested under the Policy. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 10; Mobile Fleet Ex. 17 [Doc. 34-9] at 000360 – 000379. The attached certificates included a certificate for MAR Properties that identified the Property under "Description of Operations / Locations / Vehicles" and stated that MAR Properties was an additional insured with a waiver of subrogation regarding general liability when required by written contract. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 10; Mobile Fleet Ex. 17 [Doc. 34-9] at 000379.

14. On July 15, 2022, Greenhalgh notified Amwins that it had received the Policy, but some of the requested changes had not been included. Mobile Fleet Ex. 17 [Doc. 34-9] at 000359. Greenhalgh again sent Amwins the MAR Properties certificate, which identified the Property under "Description of Operations / Locations / Vehicles." Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 11; Mobile Fleet Ex. 17 [Doc. 34-9] at 000359, 000379.

15. On July 27, 2022, the day after the accident, Greenhalgh notified Amwins that Birmingham had assigned separate addresses to the Property's two buildings. Mobile Fleet Ex. 18 [Doc. 34-10]. In doing so,

Greenhalgh stated its understanding that the Property was already insured under the Policy:

> We have 3100 9th Ave North Birmingham, AL 35203 for GL only insured on this policy. The lot has two buildings on it. One will be used as an Office and the other as an Auto Repair Shop. The City has come in and assigned an address for the Office and another address for the Shop. The 3100 9th Ave North is the office and the new address is 915 31st St N will be the shop. Please amend the General Liability to include the new address.

Mobile Fleet Ex. 18 [Doc. 34-10] at 000389.

### B. <u>The Underlying Action</u>

16. Defendant Cameo Nicole Westmoreland ("Ms. Westmoreland") is the Personal Representative and Administrator of the Estate of Joshua T. Westmoreland ("Mr. Westmoreland"). Mobile Fleet Ex. 1 [Doc. 30-1]. On October 9, 2023, Ms. Westmoreland filed a lawsuit in the Circuit Court of Jefferson County, Alabama related to Mr. Westmoreland's death: *Cameo Nicole Westmoreland, et al. v. Jon's Tree Service, LLC, et al.*, Case No. 01-CV-2023-903604 (the "Underlying Action"). *Id.*

17. On January 26, 2024, Ms. Westmoreland filed an amended complaint in the Underlying Action to add claims against Mobile Fleet. Mobile Fleet Ex. 2 [Doc. 30-2].

### C. <u>The Amended Consolidated Complaint</u>

18. On January 1, 2025, Ms. Westmoreland filed a third amended complaint in the Underlying Action (the "Consolidated Complaint"). Mobile Fleet Ex. 4 [Doc. 30-4].

19. On April 25, 2025, MUSIC filed this action seeking a declaratory judgment that it had no duty to defend or indemnify Mobile Fleet in the Underlying Action. *See* Complaint [Doc. 1] at ¶ 4. In support of its request for a declaratory judgment, MUSIC "[a]ttached . . . as Exhibit 1 [a] true and correct copy of the ***operative*** 'Consolidated Complaint' filed in the Underlying Action[], which is fully incorporated herein by reference." *Id.* at ¶ 26 (emphasis added); *see also* Complaint Ex. 1 [Doc. 1-1].

20. On July 10, 2025, Ms. Westmoreland filed an Amended Consolidated Complaint that revised her allegations against Mobile Fleet. *See* Mobile Fleet Ex. 5 [Doc. 30-5]. Each relevant count incorporates the Amended Consolidated Complaint's preceding factual allegations. *Id.* at ¶¶ 12, 21, 24. The Amended Consolidated Complaint includes the following allegations against Mobile Fleet:

a. Mobile Fleet had "its principal place of its garage operations business for heavy truck repair in Jefferson County, Alabama[.]" Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 5.

b. On July 26, 2022, Mr. Westmoreland was working at the Property and Mobile Fleet "had control and use of the [Property] for its garage operations business for heavy truck repair[.]" Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 8.

c. Mobile Fleet had leased the Property, had "control of [the Property] and was in the process of conducting maintenance and improvements[,]" and was "in control of the [Property] for the purpose of operating its heavy truck repair business there." Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 9.

d. Mobile Fleet was negligent / wanton in its "control and use of the [Property] for its garage operations business for heavy truck repair and was in the process of maintaining and making improvements to said location when [Mr. Westmoreland's] fall occurred." Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 14.

e. Mobile Fleet failed to provide a safe workplace at the Property, including fall protection, skylight protection, and a hazard-recognition program. Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 15.

f. Mobile Fleet undertook to supervise and control the workplace premises and owed a duty to make sure the roof was "safely maintained." Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 17.

g. Mobile Fleet had control over the roof premises and safety equipment, and failed to warn, train, supervise, and provide a safe work environment. Mobile Fleet Ex. 5 [Doc. 30-5] at ¶¶ 18-19.

h. Mobile Fleet had a contractual duty to provide safety equipment or a safe work environment and breached that duty by failing to provide fall-hazard information, fall-protection devices, and a safe workplace. Mobile Fleet Ex. 5 [Doc. 30-5] at ¶¶ 21-22.

i. Mobile Fleet failed to warn of dangerous roof and skylight conditions and failed to maintain a workplace safety-hazard assessment and communication program. Mobile Fleet Ex. 5 [Doc. 30-5] at ¶¶ 24-26.

**D. <u>Mr. Osborn and Mr. Hoytink's Depositions</u>**

21. Mr. Osborn was deposed in the Underlying Action on July 29, 2025. Mobile Fleet Ex. 9 [Doc. 34-1]. He testified as Mobile Fleet's corporate representative regarding the Property Lease, work at the Property, Jon's Tree Service, and Mr. Westmoreland's accident. Mobile Fleet Ex. 9 [Doc. 34-1] at 26:13 – 29:8. In that capacity, Mr. Osborn testified as follows:

a. Mobile Fleet's business provides preventive maintenance, DOT inspections, and minor and major repairs for commercial trucks. Mobile Fleet Ex. 9 [Doc. 34-1] at 19:10 – 20:23.

b. Mobile Fleet needed a larger property to facilitate its operations. Mobile Fleet Ex. 9 [Doc. 34-1] at 21:1 – 22:12. The Property offered a 12,000-square-foot warehouse and approximately two-and-one-half acres to accommodate the flow and parking of commercial vehicles. *Id.* at 21:22 – 22:12. Mobile Fleet intended to use the Property for diesel truck repair. *Id.* at 22:13 – 23:2.

c. In addition to the warehouse, the Property also contained an office building. Mobile Fleet Ex. 9 [Doc. 34-1] at 24:2 – 25:19.

d. Mobile Fleet began operating from the Property's office building after executing the Property Lease in January 2022. Mobile Fleet Ex. 9 [Doc. 34-1] at 69:8 – 70:15. It continued doing so through the date of the accident. *Id.* at 70:12–21; 106:2 – 109:1; 112:15 – 113:9; 114:16 – 115:13; 168:17 – 169:14.

e. The Property was Mr. Osborn's primary work location during the period preceding the accident: he estimated that he spent approximately 75% of his working time there between January and July of 2022. Mobile Fleet Ex. 9 [Doc. 34-1] at 70:12 – 71:18.

f. Additionally, Mobile Fleet began using the warehouse to store equipment needed for its garage operations business during the period preceding the accident. Mobile Fleet Ex. 9 [Doc. 34-1] at 168:17 – 169:14.

g. The warehouse could not fully support Mobile Fleet's operations in its existing condition, so its electrical service would need to be upgraded, truck bays would need to be created, and better entry doors would need to be installed. Mobile Fleet Ex. 9 [Doc. 34-1] at 36:15 – 37:15.

h. Mobile Fleet hired Murray Construction to perform the buildout, which was "primarily redoing the warehouse to accommodate [Mobile Fleet's] needs to run it as a business." Mobile Fleet Ex. 9 [Doc. 34-1] at 55:14 – 56:12. The work included improvements to the warehouse interior and parking lot and construction of a canopy. *Id.* at 56:2–12.

i. The warehouse's roof and skylights were part of the same conversion project because Mobile Fleet needed to waterproof the warehouse before it could spray-foam and insulate the building. Mobile Fleet Ex. 9 [Doc. 34-1] at 59:18 – 60:4. Plans for the buildout included six overhead-door bays, siding repairs, and spray-foam insulation of the roof and walls. *Id.* at 61:2 – 62:3.

j. The trees surrounding the warehouse were growing against and into the building, over the roof, and through portions of the roof and skylights. Mobile Fleet Ex. 9 [Doc. 34-1] at 38:2 – 39:19; 125:12 – 127:4. Before the tree work, the sides and rear of the warehouse were obstructed by trees, shrubs, and other growth, and the rear of the building

could not realistically be accessed until that growth was removed. *Id.* at 123:20 – 124:9.

k. When Jon Pierce came to the Property, Mr. Osborn explained Mobile Fleet's plans for the building and told him that Mobile Fleet was performing a buildout. Mobile Fleet Ex. 9 [Doc. 34-1] at 125:12–126:13.

l. Mr. Osborn described removal of the trees as "step one" of the process. Mobile Fleet Ex. 9 [Doc. 34-1] at 126:2-4. The goal was to have the trees off the building so that Mobile Fleet could then address the next step, which would be replacement of the skylights and other repairs. *Id.* at 127:10–20.

22. Mr. Hoytink was also deposed in the Underlying Action on July 29, 2025. Mobile Fleet Ex. 23 [Doc. 34-15]. He testified that he and Mr. Osborn started Mobile Fleet and he was the majority owner. *Id.* at 15:17 – 16:1. Mr. Hoytink had attended Mr. Osborn's deposition and agreed with Mr. Osborn's testimony about the Property. *Id.* at 28:11 – 29:9. Mr. Hoytink testified that Mobile Fleet was storing trucks used for its operations in the Property's warehouse prior to Mr. Westmoreland's accident. *Id.* at 30:4-8, 41:13 – 42:6; *see also* Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 9.

## III. DISPUTED FACTS

1. There is a genuine dispute concerning the nature and scope of Amwins' authority regarding the Policy and whether Greenhalgh reasonably understood Amwins to be MUSIC's authorized channel for receiving policy information and change requests. The Policy expressly identifies Amwins as MUSIC's "General Agent." MUSIC Ex. C [Doc. 32-3] at 1. In its communications with MUSIC, Amwins identified itself as the underwriter for Policy. Mobile Fleet Ex. 19 [Doc. 34-11]. Greenhalgh instructed Amwins to bind the MUSIC coverage, Amwins confirmed that coverage had been bound with MUSIC, and Amwins instructed Greenhalgh to submit any questions or requested changes to Amwins so that Amwins could address them with the carrier. Mobile Fleet Ex. 20 [Doc. 34-12]; Mobile Fleet Ex. 21 [Doc. 34-13]. Greenhalgh never communicated directly with MUSIC concerning the placement, binding, issuance, or administration of the Policy and was never instructed to submit policy information or change requests directly to MUSIC. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 5. Based on MUSIC's designation of Amwins as its "General Agent" and the parties' course of dealing, Greenhalgh understood that Amwins was authorized to receive information and instructions concerning the Policy and that information provided to Amwins would be communicated to MUSIC. *Id.*

2. There is a genuine dispute concerning whether Amwins received sufficient information before the accident to know—or at least inquire whether—Mobile Fleet intended the Property to be included under the Policy. Whether that knowledge is attributable to MUSIC follows from Amwins' role as MUSIC's designated "General Agent." On June 23, 2022, during communications concerning an endorsement to the existing Century Surety policy, Greenhalgh sent Amwins the Property Lease, which identified the Property and stated that Mobile Fleet would use it as its "Fleet Management Shop." Mobile Fleet Ex. 16 [Doc. 34-8] at 000178, 000189; MUSIC Ex. A [Doc. 32-1] at 1. On July 6, 2022 and again on July 15, 2022, Greenhalgh sent Amwins a certificate under the MUSIC Policy identifying MAR Properties and the Property under "Description of Operations / Locations / Vehicles." Mobile Fleet Ex. 17 [Doc. 34-9] at 000359–000360, 000379. Greenhalgh intended those communications to request that MAR Properties be added as an additional insured and that the Property be addressed under the Policy. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 13. On July 19, 2022, Amwins responded by sending the prior Century Surety endorsements that identified MAR Properties and the Property, further supporting an inference that Amwins understood which landlord and premises Greenhalgh's request concerned. Mobile Fleet Ex. 22 [Doc. 34-14].

This evidence supports a finding that, before the accident, Amwins knew of the Property or possessed sufficient information to require further inquiry as to the need to include the Property in the Policy. As explained below, Amwins' knowledge and notice are attributable to MUSIC.

3. There is a genuine dispute concerning whether Mobile Fleet was using the Property for its heavy-truck-repair business before the accident. Mobile Fleet began operating from the Property's office building after executing the Property Lease and continued doing so through the date of the accident. Mobile Fleet Ex. 9 [Doc. 34-1] at 69:6 – 71:18; 106:2 – 109:1; 112:15 – 113:9; 114:16 – 115:13; 168:17 – 169:14. The Property was Mr. Osborn's primary work location, where he spent approximately 75% of his working time between January and July of 2022. *Id.* at 70:21 – 71:18. Mobile Fleet also stored equipment used in its truck-repair business in the warehouse before the accident. *Id.* at 168:17 – 169:14; Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 9; Mobile Fleet Ex. 23 [Doc. 34-15] at 30:4-8, 41:13 – 42:6. This evidence supports a finding that Mobile Fleet was already using the Property for its heavy-truck-repair business, even though the warehouse buildout was not complete.

4. There is a genuine dispute concerning whether the tree removal and related roof work were necessary or incidental to Mobile Fleet's heavy-

truck-repair business. Mobile Fleet leased the Property to obtain the space needed for its truck-repair operations. Mobile Fleet Ex. 9 [Doc. 34-1] at 21:1 – 23:2. The warehouse required electrical upgrades, truck bays, improved entry doors, weatherproofing, and insulation before it could fully accommodate those operations. *Id.* at 36:15 – 37:15; 59:18 – 62:3. Trees and other growth obstructed portions of the warehouse and roof, and others would not be able to repair the roof until that growth was removed. *Id.* at 123:20 – 124:9; 125:12 – 127:20. That is why Mr. Osborn described the tree removal as "step one" of the process of building-out the warehouse for Mobile Fleet's business. *Id.* at 126:2–4. This evidence supports a reasonable finding that the work resulting in the accident was part of maintaining and preparing a location for Mobile Fleet's covered heavy-truck-repair business.

## IV. <u>LEGAL ARGUMENT</u>

Summary judgment is proper only when the movant establishes that there is no genuine dispute concerning any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).

MUSIC bears the burden of proving that the claims in the Underlying Action cannot potentially or arguably fall within the Policy and, as to its rescission theory, that the requirements of Ala. Code § 27-14-7 are satisfied. MUSIC cannot meet that burden. First, it did not seek relief concerning the Amended Consolidated Complaint (i.e., the operative complaint). Second, the Amended Consolidated Complaint and the admissible evidence reasonably support coverage under the Policy's "garage operations" provision. Third, MUSIC presented no evidence that the inadvertent omission of the Property from the 2022 Garage Application was material, while the evidence shows that MUSIC's general agent had sufficient pre-accident notice to require further inquiry. Finally, as to MUSIC's duty to indemnify, it is premature to decide that issue and deciding it now risks wasting judicial resources.

**A. MUSIC cannot obtain declaratory relief concerning a materially different underlying complaint that was never made part of its claim.**

MUSIC only included the Consolidated Complaint in its declaratory judgment claim. *See* Complaint [Doc. 1]; Complaint Ex. 1 [Doc. 1-1]. MUSIC attempts to cure its pleading defect by attaching the Amended Consolidated Complaint to the MUSIC MSJ rather than supplementing its Complaint. Mobile Fleet addressed MUSIC's pleading defect extensively in

its Brief in Support of its Motion for Partial Summary Judgment [Doc. 31] and incorporates those arguments here. The additional point relevant to the MUSIC MSJ is that a plaintiff cannot materially expand its pleaded claim through summary judgment briefing.

"At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Likewise, "a plaintiff may not amend [its] complaint through argument made in [its] brief" at summary judgment. *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013); *see also Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

This is not merely a situation in which MUSIC offers new evidence supporting an unchanged claim. MUSIC expressly alleged that the Consolidated Complaint was "the operative" complaint in the Underlying Action, attached that pleading as the basis for its requested declaration, and incorporated it into its Complaint. *See* Complaint [Doc. 1] ¶ 26; Complaint Ex. 1 [Doc. 1-1]. The subsequent Amended Consolidated Complaint superseded the Consolidated Complaint and became the operative complaint in the Underlying Action. *Ex parte Puccio*, 923 So. 2d 1069, 1072 (Ala.

2005); *Holley v. St. Paul Fire & Marine Insurance Co.*, 396 So. 2d 75, 79 (Ala. 1981). MUSIC never supplemented its Complaint to request declaratory relief concerning the Amended Consolidated Complaint.

MUSIC may submit the Amended Consolidated Complaint as evidence, but attaching it to a summary judgment motion does ***not*** amend the claim on which MUSIC seeks judgment. Because MUSIC's pleaded claim concerns the superseded Consolidated Complaint, MUSIC cannot obtain summary judgment declaring that it has no duty to defend against the materially different Amended Consolidated Complaint.

Nor should the Court effectively amend the Complaint [Doc. 1] by treating the newly attached exhibit as though it had always been incorporated into the declaratory judgment sought in the Complaint [Doc. 1]. The Eleventh Circuit has cautioned against precisely that practice: "And it goes without saying that the court is barred from amending a plaintiff's claim. One reason for barring such amendment is that in *sua sponte* amending a plaintiff's claim on summary judgment, the court may create the impression that it has become the plaintiff's advocate—or his worst enemy—depending on what the court does with the claim after amending it." *Miccosukee Tribe*, 716 F.3d at 559. Instead, the Court should evaluate the MUSIC MSJ based on the declaratory judgment claim MUSIC pled, not the

materially different declaratory judgment claim MUSIC attempts to present for the first time in the MUSIC MSJ.

**B. MUSIC has a duty to defend because the operative complaint and evidence in the Underlying Action arguably bring the claims against Mobile Fleet within the Policy's "garage operations" coverage.**

For the reasons set forth above and in Mobile Fleet's Brief in Support of its Motion for Partial Summary Judgment [Doc. 31], MUSIC has not requested declaratory relief concerning its duty to defend against the Amended Consolidated Complaint, which has been the operative complaint in the Underlying Action for over a year. That defect alone warrants denying MUSIC's request for summary judgment on its duty to defend.

Even if MUSIC had properly requested relief regarding the Amended Consolidated Complaint, its request for summary judgment would still fail. MUSIC's argument improperly limits "garage operations" to the physical repair of a truck, disregarding the Policy's express inclusion of the maintenance or use of locations for Mobile Fleet's heavy-truck-repair business and operations necessary or incidental to that business. The Amended Consolidated Complaint alleges an accident resulting from those "garage operations," and facts provable by admissible evidence in the Underlying Action independently support at least a reasonable inference of coverage. Thus, based on either the allegations in the Amended

Consolidated Complaint ***or*** the facts provable by admissible evidence in the Underlying Action, MUSIC owes a duty to defend at least the claims based on a covered accident or occurrence.

### 1. <u>MUSIC's duty to defend is broader than MUSIC acknowledges.</u>

As a threshold matter, MUSIC's argument incorrectly treats the allegations of the Amended Consolidated Complaint as the exclusive basis for determining its duty to defend. MUSIC argues that "[w]here the underlying complaint, on its face, alleges facts that do not come within the policy's coverage, no duty to defend arises." MUSIC MSJ [Doc. 32] at 11. Alabama law expressly rejects the premise that an insurer's duty to defend must be determined solely from the allegations against the insured. *See Hartford Cas. Ins. Co. v. Merchs. & Farmers Bank*, 928 So. 2d 1006, 1009–1010 (Ala. 2005) ("'However, 'this Court … has rejected the argument that the insurer's obligation to defend must be determined solely from the facts alleged in the complaint in the action against the insured.'") (internal citations omitted, ellipses in the original).

Instead, Alabama applies a two-part inquiry. Coverage may be established either by the allegations of the underlying complaint or, when those allegations do not establish coverage, by facts that may be proved through admissible evidence:

> If the allegedly injured person's complaint against the insured alleges a covered accident or occurrence, then the insurer owes the duty to defend even though the evidence may eventually prove that the gravamen of the complaint was not a covered accident or occurrence. If the complaint against the insured does not, on its face, allege a covered accident or occurrence, but the evidence proves one, then the insurer likewise owes the duty to defend. The insurer owes no duty to defend only if neither does the complaint against the insured allege a covered accident or occurrence nor does the evidence in the litigation between [the injured person] and the insured prove a covered accident or occurrence.

*Hartford*, 928 So. 2d at 1010 (internal citations omitted, brackets in the original).

Thus, facts outside the operative complaint may establish a duty to defend when the allegations alone are insufficient, but facts outside the operative complaint may not eliminate a duty already established by allegations in the operative complaint. *Hartford*, 928 So. 2d at 1010 ("'[T]his Court has never held that, even though the allegations of the complaint ***do*** allege a covered accident or occurrence, the courts may consider evidence outside the allegations to disestablish the duty to defend[.]'") (internal citations omitted, emphasis in the original). Moreover, if the operative complaint leaves any uncertainty about whether the claim falls within coverage, the insurer must investigate the facts surrounding the incident before refusing to defend. *Id.* (internal citations omitted).

Accordingly, MUSIC can obtain summary judgment on its duty to defend only if the Amended Consolidated Complaint does not allege a covered occurrence ***and*** the admissible evidence in the Underlying Action does not establish one. As explained below, MUSIC cannot satisfy that standard.

**2. MUSIC improperly reduces "garage operations" to the moment a mechanic physically repairs a truck.**

MUSIC's only coverage argument is that Mr. Westmoreland's accident did not result from "garage operations" because he was performing tree or roof work rather than repairing a truck. MUSIC MSJ [Doc. 32] at 12–16. That argument improperly reduces the Policy's definition of "garage operations" to the act of physically repairing a truck.

Alabama courts enforce an unambiguous insurance policy according to its terms and give policy-defined language the meaning supplied by the policy. *Twin City Fire Insurance Co. v. Alfa Mutual Insurance Co.*, 817 So. 2d 687, 691–692 (Ala. 2001). If policy language is reasonably susceptible to more than one interpretation, however, it must be construed liberally in favor of the insured and strictly against the insurer. *Id.* at 695; *see also American States Insurance Co. v. C.F. Halstead Developers, Inc.*, 588 So. 2d 870, 872 (Ala. 1991).

MUSIC agreed to pay damages for bodily injury caused by an accident and "resulting from 'garage operations' other than the ownership, maintenance or use of covered 'autos.'" MUSIC Ex. C [Doc. 32-3] at 41. MUSIC also assumed "the right and duty to defend any 'insured' against a 'suit' asking for these damages." *Id.*

The Policy defines "garage operations" to mean "the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations." MUSIC Ex. C [Doc. 32-3] at 55. It adds that "'[g]arage operations' also include all operations necessary or incidental to a garage business." *Id.* The definition therefore identifies independent ways in which an accident may result from "garage operations." The ways include maintenance ***or*** use of a location for garage business. They also include an operation necessary ***or*** incidental to that business.

The Schedule of Operations Endorsement identifies Mobile Fleet's insured garage business as "Heavy Truck Repair." MUSIC Ex. C [Doc. 32-3] at 13. That prevents Mobile Fleet from claiming coverage for an entirely different type of business, like operating a restaurant, or a construction company, or a garage business that only repairs small cars or motorcycles. It does ***not*** redefine "garage operations," delete the definition's separate

reference to the maintenance or use of locations, or require that an accident occur while a truck is physically undergoing repair. Read together, the provisions cover bodily injury resulting from Mobile Fleet's maintenance or use of a location for its heavy-truck-repair business, as well as from other operations necessary or incidental to that business.

Mobile Fleet is not aware of a decision from an Alabama appellate court examining the "garage operations" definition in circumstances like those presented here. The Louisiana Court of Appeals, however, has done so. In *Davis v. Catlin Specialty Insurance Co.*, 80 So. 3d 580, 581-583 (La. Ct. App. 2011), a non-employee died in a fire while sleeping at the insured garage after business hours. The insurer argued that the claim did not arise from "garage operations" because the decedent's presence was neither necessary nor incidental to the garage business. *Id.* at 583-584. The court rejected that argument because the ownership, maintenance, or use of a location for garage business were each an independent basis for coverage. *Id.* at 584. The policy therefore covered claims arising from premises defects even though the injury did not occur during the actual performance of garage work. *Id.* As the court explained:

> It is irrelevant whether the business was open and operating at the time of the fire; similarly, it is irrelevant why [the non-employee] was on the premises. Under the language of the

> policy, it is the ownership of the premises as a garage business by the [garage owner] that gives rise to coverage.

*Id.*

The same reasoning applies here. The relevant question is not simply whether Mr. Westmoreland was repairing a truck when he fell. It is whether the claims result from Mobile Fleet's maintenance ***or*** use of the Property as a location for its heavy-truck-repair business, ***or*** from another operation necessary ***or*** incidental to that business. A claim satisfying any of those alternatives falls within the Policy's definition of "garage operations." At a minimum, MUSIC's contrary interpretation creates an ambiguity that must be resolved in favor of coverage. *American States*, 588 So. 2d at 872.

**3. <u>The Amended Consolidated Complaint alleges an accident resulting from Mobile Fleet's use and maintenance of a location for its heavy-truck-repair business.</u>**

MUSIC dismisses the Amended Consolidated Complaint's references to Mobile Fleet's heavy-truck-repair business as conclusory labels. The Amended Consolidated Complaint does not merely recite the Policy's definition of "garage operations." It identifies the Property, explains how Mobile Fleet was using it, describes the maintenance and improvements being performed there, and alleges premises-related failures that caused Mr. Westmoreland's fall.

Specifically, the Amended Consolidated Complaint alleges that Mobile Fleet controlled and used the Property "for its garage operations business for heavy truck repair." Mobile Fleet Ex. 5 [Doc. 30-5] at ¶ 8. It further alleges that Mobile Fleet leased and controlled the Property, was maintaining and improving it, and intended to operate its heavy-truck-repair business there. *Id.* at ¶¶ 9, 14. Those are factual allegations concerning the Property, Mobile Fleet's use of the Property, and the purpose of the work being performed there. They correspond directly to the Policy's definition of "garage operations," which includes the maintenance or use of locations for Mobile Fleet's heavy-truck-repair business.

The Amended Consolidated Complaint's remaining allegations must be read in that context. It alleges that Mobile Fleet undertook to control and safely maintain the workplace but failed to protect the roof and skylights, provide fall protection, or warn of dangerous conditions, thereby causing Mr. Westmoreland's fall. Mobile Fleet Ex. 5 [Doc. 30-5] at ¶¶ 15, 17–19, 21–22, 24–26. Thus, the Amended Consolidated Complaint does not allege merely that an unrelated accident happened on property occupied by Mobile Fleet. It alleges that Mobile Fleet was using and maintaining the Property for its heavy-truck-repair business and that its negligent maintenance and control of those premises caused the accident.

Read together, those allegations reasonably support the inference that the accident resulted from Mobile Fleet's maintenance or use of a location for its heavy-truck-repair business. *See Davis v. Catlin Specialty Insurance Co.*, 80 So. 3d 580, 583–84 (La. Ct. App. 2011). They are ***not*** allegations divorced from Mobile Fleet's heavy-truck-repair business. *See Factory Outlet Mobile Home Sales, Inc. v. Northwestern National Insurance Co.*, 596 So. 2d 908, 909 (Ala. 1992) (finding no coverage under a "garage operations" policy where the injury occurred at the garage owner's home, which was not a location owned, maintained, or used for the owner's garage business). The Amended Consolidated Complaint alleges an accident within the Policy's coverage, meaning MUSIC owes a duty to defend at least the claims based on a covered accident or occurrence.

**4. Facts provable by admissible evidence in the Underlying Action independently support a reasonable inference of coverage.**

Even if the Amended Consolidated Complaint alone were insufficient to show that MUSIC owes a duty to defend at least the claims based on a covered accident or occurrence, facts provable by admissible evidence in the Underlying Action may independently establish that duty. *Hartford*, 928 So. 2d at 1010, 1012–1013. Mr. Osborn and Mr. Hoytink's deposition testimony supports a reasonable inference that the accident resulted from Mobile

Fleet's use and maintenance of the Property as a location for its heavy-truck-repair business and from operations necessary or incidental to that business.

Mobile Fleet selected the Property specifically to obtain the space needed for its truck-repair operations. Mobile Fleet Ex. 9 [Doc. 34-1] at 21:1 – 23:7. Although the warehouse buildout was incomplete, Mobile Fleet was already operating its business from the Property's office building, Mr. Osborn spent approximately 75% of his working time there, and Mobile Fleet stored equipment used in its heavy-truck-repair business in the warehouse. *Id.* at 69:8 – 71:18; 168:17 – 169:14; Mobile Fleet Ex. 10 [Doc. 34-2] at ¶ 9; Mobile Fleet Ex. 23 [Doc. 34-15] at 30:4-8, 41:13 – 42:6. The Property was not merely a prospective business location awaiting future use; Mobile Fleet was already using it for its heavy-truck-repair business before the accident.

The warehouse was not yet ready to fully accommodate truck-repairs because it required electrical upgrades, truck bays, improved access, weatherproofing, and insulation. Mobile Fleet Ex. 9 [Doc. 34-1] at 36:22 – 38:17; 59:18 – 62:3. Trees and other growth obstructed portions of the warehouse and roof, which would prevent others from fully accessing or repairing the roof. *Id.* at 123:20 – 124:9; 125:12 – 127:20. Mr. Osborn described the tree removal as "step one" of the process: the trees had to be

removed before Mobile Fleet could have others evaluate and repair the roof, replace the skylights, weatherproof the warehouse, and continue preparing it for truck-repair operations. *Id.* at 126:2–4; 127:10–20.

This evidence supports a reasonable inference that the accident resulted from Mobile Fleet's maintenance and preparation of a location it was already using for its heavy-truck-repair business. It also supports the alternative inference that the tree removal and related roof work were operations necessary or incidental to that business. At a minimum, those reasonable inferences preclude summary judgment for MUSIC. Under *Hartford*, they also independently show that MUSIC owes a duty to defend at least the claims based on a covered accident or occurrence.

**5. *Hartford* does not permit MUSIC to disregard consistent allegations and evidence supporting coverage.**

MUSIC relies on *Hartford* for the proposition that descriptive facts control over irreconcilable legal labels. MUSIC MSJ [Doc. 32] at 11. But *Hartford* applies only when the complaint's descriptive facts are irreconcilable with the legal characterization offered to establish coverage. *Hartford*, 928 So. 2d at 1012 ("We therefore conclude that when the complaint supplies descriptive facts and those facts are irreconcilable with a legal theory, such as 'negligence,' asserted in the complaint, the facts, not

the mere assertion of the legal theory, determine an insurer's duty to defend."). That led the Alabama Supreme Court to conclude that the unsupported negligence label could not transform the alleged intentional conduct into a covered accident. *Id.*

No comparable contradiction exists here. The allegations that Mr. Westmoreland was performing tree and roof work are entirely consistent with the allegations that Mobile Fleet was maintaining and improving the Property for its heavy-truck-repair business. The former describes the immediate work; the latter describes its purpose and relationship to Mobile Fleet's use and maintenance of the Property. Both can be true, and Mr. Osborn's testimony explains how they fit together.

Even after determining that the complaint in *Hartford* did not allege a covered occurrence, the Alabama Supreme Court separately considered whether facts provable by admissible evidence in the underlying case against the insured established or supported a reasonable inference of coverage. *Hartford*, 928 So. 2d at 1012–13. Accordingly, MUSIC cannot use *Hartford* to disregard Mr. Osborn's testimony (and Mr. Hoytink's additional testimony) concerning Mobile Fleet's existing use of the Property and the relationship between the tree and roof work and the warehouse buildout.

MUSIC treats the nature of Mr. Westmoreland's work (i.e., tree and roof work) as dispositive. But the Policy expressly includes the maintenance or use of locations for a garage business (in this case, a heavy-truck-repair business) and operations necessary or incidental to that business. The relevant question is how the work related to Mobile Fleet's use and maintenance of the Property for its heavy-truck-repair business, not whether Mr. Westmoreland was personally repairing a truck when the accident occurred.

**6. <u>MUSIC must at least defend the claims falling within the Policy's coverage</u>.**

"When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy." *Tanner v. State Farm Fire & Casualty Co.*, 874 So. 2d 1058, 1064 (Ala. 2003). Thus, even if MUSIC could establish that some claims or theories in the Amended Consolidated Complaint fall outside the Policy, that would not eliminate its duty to defend the claims arising from Mobile Fleet's use and maintenance of the Property as a location for its heavy-truck-repair business. Because the Amended Consolidated Complaint alleges, and the admissible evidence independently supports a reasonable inference, that Mr. Westmorland's accident resulted from those "garage

operations," MUSIC is not entitled to summary judgment declaring that it owes no duty to defend.

### C. <u>MUSIC has not established its alternative rescission theory.</u>

MUSIC alternatively argues that if the Property was a location of Mobile Fleet's "garage operations," then Mobile Fleet's failure to list it in the 2022 Garage Application requires rescission of the Policy. MUSIC MSJ [Doc. 32] at 17-19. MUSIC's argument does not establish entitlement to summary judgment.

#### 1. <u>MUSIC presented no evidence that the omission was material to its acceptance of the risk or the hazard assumed.</u>

Alabama law governs the effect of "[m]isrepresentations, omissions, concealment of facts and incorrect statements" in an insurance application. Ala. Code § 27-14-7(a). Those things do not prevent recovery under the resulting policy unless:

> (1) Fraudulent;
>
> (2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
>
> (3) The insurer in good faith would either not have issued the policy or contract, or would not have issued a policy or contract at the premium rate as applied for, or would not have issued a policy or contract in as large an amount or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been made

> known to the insurer as required either by the application for the policy or contract or otherwise.

Ala. Code § 27-14-7(a).

MUSIC does not contend that the Property's omission from the 2022 Garage Application justifies rescission under subsection (a)(1) or (a)(3). *See* MUSIC MSJ [Doc. 32] at 17–19. Instead, MUSIC relies only on subsection (a)(2). *Id.* at 17-18. That subsection requires proof that the omission was "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer." Ala. Code § 27-14-7(a)(2).

Whether an omission materially affected the insurer's risk is generally a question of fact. *Bennett v. Mutual of Omaha Insurance Co.*, 976 F.2d 659, 661 (11th Cir. 1992); *State Farm Ins. Co. v. Whiddon*, 515 So. 2d 1266, 1268 (Ala. Civ. App. 1987) ("Alabama courts have consistently held that the issue of whether a particular fact increases the risk of loss assumed by an insurance company—that is, whether it is material to the insurance coverage—is generally one for the jury."). Moreover, even an insurer's uncontradicted underwriting testimony that omitted information was material is not necessarily dispositive. *Bennett*, 976 F.2d at 661.

MUSIC submitted ***no*** underwriter affidavit, underwriting guideline, rating analysis, expert testimony, or other evidence explaining how the Property affected the nature or degree of the risk MUSIC accepted or the

hazard it assumed. Indeed, MUSIC identifies ***no*** evidence showing that adding another location altered the risk associated with Mobile Fleet's scheduled heavy-truck-repair business. MUSIC simply declares the omission material in its brief, but "[s]tatements by counsel in briefs are not evidence." *Travaglio v. American Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) (internal quotation marks omitted).

Because MUSIC seeks summary judgment on a statutory basis for avoiding its Policy, MUSIC bears the burden of producing evidence establishing the omission's materiality. Its unsupported assertion does not satisfy that burden, so MUSIC is not entitled to summary judgment under Ala. Code § 27-14-7(a)(2).

**2. The evidence supports a finding that MUSIC, through Amwins, had sufficient notice of the omitted Property to require further inquiry.**

Even if MUSIC had produced evidence establishing materiality under Ala. Code § 27-14-7(a)(2), Alabama's notice-and-inquiry rule independently precludes summary judgment. "Alabama's common law . . . alleviates the severity of § 27-14-7 by recognizing a widely adopted exception that 'the policy is not avoided if the insurer knows the true facts, or the falsity of the statements, or has sufficient indications that would put a prudent person on notice so as to induce an inquiry which, if done with reasonable

thoroughness, would reveal the truth.'" *Stephens v. Guardian Life Ins. Co.*, 742 F.2d 1329, 1333 (11th Cir. 1984) (quoting *Bankers Life & Casualty Co. v. Long*, 345 So. 2d 1321, 1323 (Ala. 1977)). Whether the information supplied would prompt a reasonably prudent insurer to investigate is ordinarily a question of fact. *Id.*

The evidence supports a finding that Amwins was authorized to receive information and change requests concerning the Policy on MUSIC's behalf. The Policy identifies Amwins as MUSIC's "General Agent." MUSIC Ex. C [Doc. 32-3] at 1. Amwins acted as the Policy's underwriter, accepted Greenhalgh's instruction to bind coverage, confirmed that the MUSIC coverage had been bound, and instructed Greenhalgh to submit questions and requested changes through Amwins for communication to the carrier. Mobile Fleet Ex. 19 [Doc. 34-11]; Mobile Fleet Ex. 20 [Doc. 34-12]; Mobile Fleet Ex. 21 [Doc. 34-13]. Greenhalgh never communicated directly with MUSIC concerning the Policy's placement, issuance, or administration. Mobile Fleet Ex. 11 [Doc. 34-3] at ¶ 5. Alabama law attributes to a principal notice received by its agent that the agent ought, in good faith and the exercise of ordinary care, to communicate to the principal. *See* Ala. Code § 8-2-8 ("As against a principal, both principal and agent are deemed to have

notice of whatever either has notice of and ought in good faith and the exercise of ordinary care and diligence to communicate to the other.”).

The evidence supports a finding that Amwins received sufficient information before the accident to require further inquiry about the Property. On June 23, 2022, Greenhalgh sent Amwins the Property Lease, which identified the Property and stated that Mobile Fleet would use it as its “Fleet Management Shop.” Mobile Fleet Ex. 16 [Doc. 34-8] at 000178, 000189; MUSIC Ex. A [Doc. 32-1] at 1. On July 6, 2022, Greenhalgh sent Amwins a certificate identifying MAR Properties and the Property under “Description of Operations / Locations / Vehicles” and requesting additional-insured and waiver-of-subrogation endorsements under the Policy. Mobile Fleet Ex. 17 [Doc. 34-9] at 000360–000379. On July 15, 2022, after advising Amwins that requested changes were missing from the Policy, Greenhalgh re-sent the certificate identifying MAR Properties and the Property. *Id.* at 000359, 000379. On July 19, 2022, Amwins responded by sending the prior Century Surety endorsements that identified the same landlord and Property. Mobile Fleet Ex. 22 [Doc. 34-14].

All those communications occurred ***before*** Mr. Westmoreland’s accident. The communications support a reasonable inference that Amwins knew Mobile Fleet leased and intended to use the Property and that

Greenhalgh was requesting Policy changes relating to that location. They also provided a direct means of discovering the omission. Had Amwins asked why Greenhalgh supplied the Property Lease and repeatedly requested endorsements concerning MAR Properties and that address, Greenhalgh could have confirmed that the Property was Mobile Fleet's fleet-management location and had been inadvertently omitted from the 2022 Garage Application. *See Stephens*, 742 F.2d at 1333.

At a minimum, the evidence creates genuine disputes concerning the scope of Amwins' authority, whether its notice is attributable to MUSIC, whether the pre-accident communications required further inquiry, and whether a reasonable inquiry would have revealed the Property's omission and use. Therefore, MUSIC is not entitled to summary judgment rescinding the Policy.

**D. <u>The Court should decline to address MUSIC's duty to indemnify.</u>**

As explained in Mobile Fleet's Brief in Support of its Motion for Partial Summary Judgment [Doc. 31], the Court should decline to address MUSIC's duty to indemnify. Mobile Fleet incorporates those arguments by reference, and will only summarize them here.

"Recognizing that the duty to indemnify cannot be determined at a 'preliminary stage in the proceedings,' district courts in our circuit have

declined to address the duty to indemnify when determining whether there is a duty to defend." *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1252 (11th Cir. 2022) (internal citations omitted). Specifically, "many district courts in this circuit have ruled that an insurer's duty to indemnify is not ripe until the underlying lawsuit is resolved or the insured's liability is established." *Mid-Continent Cas. Co. v. Delacruz Drywall Plastering & Stucco, Inc.*, 766 Fed. Appx. 768, 770 (11th Cir. 2019). This Court has reached that conclusion in a prior case. *See State Farm Fire & Cas. Co. v. GHW, III*, 56 F. Supp. 3d 1210, 1215 (N.D. Ala. 2014).

Here, the Underlying Action remains pending and Mobile Fleet has not been found liable. That means it is premature to decide MUSIC's duty to indemnify and deciding that issue now risks wasting judicial resources.

## V. CONCLUSION

MUSIC cannot obtain relief concerning the Amended Consolidated Complaint through a claim it never pled. Even if it had been properly pled, the Amended Consolidated Complaint and admissible evidence in the Underlying Action independently support MUSIC's duty to defend. Relying only on its counsel's arguments and no other evidence, MUSIC has not established a right to rescind the Policy and Amwins (MUSIC's "General Agent″) received sufficient information before the accident to require further

inquiry about the Property. Finally, the Court should decline to address MUSIC's duty to indemnify while the Underlying Action remains pending. For all those reasons, the MUSIC MSJ should be denied.

Respectfully submitted,

*<u>/s/ James E. Murrill, Jr.</u>*
Robert R. Riley, Jr. (ASB-8310-Y75R)
James E. Murrill, Jr. (ASB-4329-A57M)

<u>OF COUNSEL</u>:
**RILEY & JACKSON, P.C.**
3530 Independence Drive
Birmingham, Alabama 35209
(205) 879-5000 *telephone*
(205) 879-5901 *facsimile*

# CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2026, a copy of the foregoing was electronically filed with the Clerk of the Court using the Pacer system, which sends notification of such filing to the following counsel of record in this cause:

Kenneth W. Boyles, Jr.
Maggie Arellano
PHELPS DUNBAR, LLP
2001 Park Place North, Ste. 700
Suite 1000
Birmingham, AL 35203
kenneth.boyles@phelps.com
maggie.arellano@phelps.com

Keith T Belt, Jr.
William Ryan Myers
BELT, BRUNER & BARNETT PC
880 Montclair Road
Suite 300
Birmingham, AL 35213
keithb@beltlawfirm.com
ryanm@beltlawfirm.com

*/s/ James E. Murrill, Jr.*
OF COUNSEL