FILED
2026 Aug-10 PM 11:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

MESA UNDERWRITERS SPECIALTY INSURANCE COMPANY,

Plaintiff,

Case No. 2:25-cv-00659-MHH

v.

MOBILE FLEET SPECIALISTS OF BIRMINGHAM, INC., et al.,

Defendants.

**DEFENDANT CAMEO NICOLE WESTMORELAND'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Cameo Nicole Westmoreland responds in opposition to Plaintiff Mesa Underwriters Specialty Insurance Company's ("MUSIC") Motion for Summary Judgment (Doc. 32). MUSIC's motion is due to be denied, and in support thereof, Westmoreland states as follows:

MUSIC's motion fails on the record it chose to present. The Amended Consolidated Complaint ("Operative Complaint") alleges that Mobile Fleet controlled and used the premises for its heavy-truck-repair garage business and was maintaining and improving the property when the Decedent Joshua Westmoreland ("Joshua") fell. The Policy expressly includes the ownership, maintenance, and use of garage-business locations and operations necessary or

incidental to that business. That is enough to trigger a defense. MUSIC cannot defeat that duty with extrinsic evidence or by calling the work "construction."

Indemnity is not ripe for the same reason MUSIC's factual arguments are premature: the underlying action has not fixed the facts that will determine Mobile Fleet's liability. That includes Joshua's disputed legal relationship with Jon's Tree Service. This Court should not decide that issue here.

Rescission fails too. MUSIC proves that 3100 9th Avenue North was omitted from the application. It does not prove that the omission was material under Ala. Code § 27-14-7(a)(2). The duty to defend exists now. Rescission has not been established. Indemnity should wait. MUSIC's Motion for Summary Judgment is therefore due to be denied.

## A. Response to MUSIC's Statement of Undisputed Facts

3. Disputed regarding MUSIC's characterization of the requested information as "material." The application asks for "Locations" and "Operations at Location" and identifies the locations Mobile Fleet supplied. (Doc.32-2, p.1, 3-6). It does not contain language expressly referring to leased future locations, unopened premises, or properties under improvement. *See generally* (Doc.32-2). Nor does the application itself state that omission of 3100 9th Avenue North was material to MUSIC's acceptance of the risk or hazard assumed. *See generally* (*id.*).

**10.** Undisputed only as to the language of the Schedule of Operations Endorsement and its listing of Class Code 1929, "Heavy Truck Repair." (Doc.32,

p.5 [¶10]). Westmoreland disputes MUSIC's characterization that the Schedule eliminates or replaces the Policy's separate definition of "garage operations." (Doc.32-3, p.55).

17. Undisputed to the extent Paragraph 17 accurately states the alternative allegations of the Amended Consolidated Complaint ("Operative Complaint"). Westmoreland disputes any suggestion that Joshua Westmoreland's legal relationship with Jon's Tree Service ("JTS") has been established. The Operative Complaint alleges that Joshua was "engaged, employed and/or contracted" by JTS. (Doc.32-6, p.4 [¶13]). His legal relationship with JTS remains disputed in the underlying action. (*Id.*, p.4-6 [¶¶13, 16]); *see also* (Doc.37-1 [Ex.A, JTS Verified Complaint for Declaratory Judgment], p.2 [¶4]).

24. Disputed as incomplete. Mobile Fleet stated that it had not completed its move into the warehouse by July 26, 2022, but before the accident, Mobile Fleet stored equipment from its other shops in the warehouse. (Doc.37-2 [Ex.B, Osborn Dep.], p.42-43 [168:17-169:14]).[1]

## B. Additional Undisputed Facts

1. Mobile Fleet leased 3100 9th Avenue North in January 2022 for use as a "Fleet Management Shop" operating as "Mobile Fleet Specialists, Truck

[1] Mobile Fleet had leased the property in January 2022, and the lease restricted its use to a "Fleet Management Shop" operating as "Mobile Fleet Specialists, Truck Service and Repair and Truck Wash." (Doc.32-1, p.1).

Service and Repair and Truck Wash," and "for no other or different use or purpose." (Doc.32-1, p.1).

2. The lease made Mobile Fleet responsible for maintenance and repairs to the leased premises, including obligations concerning the building, roof, exterior, and grounds. (Doc.32-1, p.1-3, 14). It also required Mobile Fleet to repair roof leaks within a reasonable time. (*Id.*, p.3).

3. Mobile Fleet selected the property to support its Birmingham truck-service operation, including truck flow, parking, an onsite truck wash, and diesel-truck repair. (Doc.37-2, p.6 [22:1-19]). Its corporate representative, Jeff Osborn, testified that the property's principal business purpose was diesel-truck repair and that the completed facility contained five diesel-repair bays. (*Id.*, p.6 [21:8-23:7]).

4. Before the accident, Mobile Fleet stored equipment from its other shops in the warehouse. (Doc.37-2, p.42-43 [168:17-169:14]). Mobile Fleet's use of the warehouse was "for garage operations in the intent for our business." (*Id.*).

5. The Policy defines "garage operations" to include "the ownership, maintenance or use of locations for garage business" and "all operations necessary or incidental to a garage business." (Doc.32-3, p.55).

6. On February 17, 2022, Greenhalgh Insurance Agency requested that 3100 9th Avenue North be added as "Location 3" to Mobile Fleet's then-existing garage policy. The accompanying email stated: "No sales at this location yet." (Doc.37-3 [Ex.C], p.1-3).

7. Century Surety thereafter endorsed Mobile Fleet's predecessor garage policy to add "Location No. 3: 3100 9th Ave. North, Birmingham, AL 35203" under "LOCATIONS WHERE YOU CONDUCT GARAGE OPERATIONS." (Doc.37-3, p.11-12).

8. Mobile Fleet evaluated work needed to prepare the warehouse for its intended truck-repair use, including roof and skylight work. (Doc.37-2, p.9, 17 [36:3-23; 67:1-20]). Mobile Fleet retained JTS to remove trees before planned roof and skylight repairs. (Doc.32-7, p.7 [ROG 11]).

9. Mobile Fleet retained JTS to cut and remove trees along and around the building. (Doc.32-7, p.7-10 [ROG 11, 14]). Before JTS began work, Osborn and Jon Pierce walked the property. (*Id.*). Broken skylights and trees growing through skylights and onto the roof were discussed and that roof and skylight repairs were planned after the tree work. (*Id.*); *see also* (Doc.37-2, p.35 [137:8-16]); (Doc.37-4 [Ex.D, Pierce Dep.], p.21 [81:3-20]).

10. MUSIC's August 2022 claim materials stated that Mobile Fleet was leasing the building, preparing it for occupancy, and had hired a tree service to perform work there. MUSIC's September 12, 2022, coverage letter likewise described the warehouse as under renovation and stated that Mobile Fleet hired JTS to cut and remove trees as part of that work. (Doc.37-5 [Ex.E], p.1-2); (Doc.37-6 [Ex.F], p.2).

11. The Operative Complaint alleges that Mobile Fleet leased and controlled the property; had control and use of the premises "for its garage operations business for heavy truck repair"; and was maintaining and improving the location when the accident occurred. (Doc.32-6, p.3 [¶¶8-9]).

12. The Operative Complaint alleges that the Decedent, Joshua Westmoreland, was "engaged, employed and/or contracted" by JTS. (Doc.32-6, p.3-4 [¶¶8-9, 13]).

13. The Operative Complaint alleges that "[b]ecause the decedent Joshua Westmoreland's status relative to the defendants is unclear and remains a fact question to be decided by the jury, this Complaint is intentionally pled in the alternative with independent liability as well as employee-based claims. (Doc.32-6, p.5-6 [¶16]).

14. JTS previously filed a verified declaratory-judgment complaint attesting under penalty of perjury that Joshua was not its employee and that a controversy existed concerning that issue. *See generally* (Doc.37-1, p.2 [¶4]) ("[JTS] does not admit that [Joshua] was an employee of [JTS] at the time of his death and that even if he were ([JTS] makes no such admission) [JTS] asserts that [Joshua's] accident, injuries and death did not arise out of or in the course of [Joshua's] employment . . . . Therefore, a controversy exists as to whether [Joshua] was an employee of [JTS] at the time of his accident" and "as to whether

[Joshua's] fall arose out of and in the course of his employment with [JTS] (if [he] was indeed employed by [JTS])").

15. MUSIC's June 14, 2024, reservation-of-rights letter described the underlying pleading as asserting alternative theories "based on the unclear employment status of Joshua Westmoreland." (Doc.30-3, p.4).

16. MUSIC's summary-judgment evidentiary submission includes no underwriter affidavit, underwriting guidelines, rating analysis, or underwriting testimony addressing the material effect of omitting 3100 9th Avenue North. *See generally* (Doc.32).

### C. Summary Judgment Standard

The standard for reviewing a summary judgment motion is well-settled. The Court can only grant summary judgment if there are no disputes as to any material fact, and all inferences must be made in favor of the non-movant:

> Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility

> determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual [*1330] determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

*Essex Ins. Co. v. Foley*, 827 F. Supp. 2d 1326, 1329-1330 (S.D. Ala. 2011); *see also e.g., Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (summary judgment only proper where the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party").

## D. LEGAL ARGUMENT

Alabama law regarding the "construction of insurance policies is well settled and clear. 'The contract of insurance will be construed strictly against the insurer and liberally in favor of the insured . . . . Exceptions to coverage in a policy of insurance must be interpreted as narrowly as possible in order to provide maximum coverage of the insured.'" *Cowart v. GEICO Cas. Co.*, 296 So. 3d 266, 270 (Ala. 2019) (citations omitted).[2]

---

[2] *See also Allstate Ins. Co. v. Skelton*, 675 So. 2d 377, 379-380 (Ala. 1996) (insurance policy shall "be construed liberally in favor of the insured and strictly against the insurer. . . . Exclusions are to be interpreted as narrowly as possible, so as to provide maximum coverage for the insured, and are to be construed most strongly against the insurance company, which drafted and issued the policy"); *Indus. Chem. & Fiberglass Corp. v. Hartford Acc. & Indem. Co.*, 475 So. 2d 472, 479 (Ala. 1985) (insurance "policies are to be construed in favor of the insured"),

Under Alabama law, the duty to defend and the duty to indemnify are distinct obligations that must be analyzed separately. *Tanner v. State Farm Fire & Cas. Co.*, 874 So. 2d 1058 (Ala. 2003); *see also Am. Chems. & Equip., Inc. v. Cont'l Cas. Co.,* 2018 U.S. Dist. LEXIS 161426, *13 (N.D. Ala. Sept. 21, 2018) ("duty to defend is broader than the duty to indemnify"). The duty to defend turns primarily on the allegations in the underlying complaint; the duty to indemnify turns on the insured's actual conduct and the actual basis on which liability is imposed. *Id.*; *Hartford Cas. Ins. Co. v. Merchants & Farmers Bank*, 928 So. 2d 1006, 1013 (Ala. 2005). Because indemnity often depends on facts developed in the underlying action, courts generally defer that question until liability and the factual basis for it are fixed. *See James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1252 (11th Cir. 2022). That distinction frames the motion here: the duty to defend is ripe now; indemnity is not.

### 1. THE OPERATIVE COMPLAINT TRIGGERS MUSIC'S DUTY TO DEFEND

"If the allegations of the injured party's complaint show an accident or an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured." *Hartford*, 928 So. 2d at 1009; *see also Tanner*, 874 So. 2d at 1063-65. The Policy "must be construed in light of the interpretation that ordinary [people] would place upon the language used in the policy." *Edwards Dodge, Inc. v. Pa. Nat'l Mut. Cas. Ins. Co.*, 510 So.

2d 225, 226 (Ala. 1987) (citation omitted). Any ambiguity in a policy is to be construed liberally in favor of the insured. *Hartford*, 928 So. 2d at 1011.

"If the allegations of the injured party's complaint show an accident or an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured."[3] *Id*. at 1009. The question becomes whether the Operative Complaint alleges a potentially covered occurrence. If it does, MUSIC owes a defense. And once the complaint alleges potential coverage, Alabama law does not permit extrinsic evidence to "disestablish the duty to defend." *Tanner*, 874 So. 2d at 1064-65.

"If the allegations of the injured party's complaint show an accident or an occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured." *Hartford*, 928 So. 2d at 1009.[1] If it does, MUSIC owes a defense. And once the complaint alleges potential coverage, Alabama law does not permit extrinsic evidence to "disestablish the duty to defend." *Tanner*, 874 So. 2d at 1064–65.

The Operative Complaint alleges an accident, occurrence, or claim within the Policy's coverage. It alleges that Mobile Fleet leased and controlled the

---

[3] The "broad duty on the part of an insurer to defend an insured arises out of the principle that an ambiguous insurance policy is to be construed liberally in favor of the insured and strictly against the insurer." *Hartford Cas. Ins. Co. v. Merchs. & Farmers Bank*, 928 So. 2d 1006, 1011 (Ala. 2005). If the complaint against the insured alleges a covered occurrence, "the insurer owes the duty to defend even though the evidence may eventually prove that the gravamen of the complaint was not" a covered occurrence. *Hartford*, 928 So. 2d at 1010. Additionally, "if the complaint against the insured does not, on its face, allege a covered accident or occurrence, but the evidence proves one, then the insurer likewise owes the duty to defend." *Id*.

premises, used them "for its garage operations business for heavy truck repair," and was maintaining and improving the property when the accident occurred. (Doc. 32-6, p.3 [¶¶ 8-9]). The Policy defines "garage operations" to include "the ownership, maintenance or use of locations for garage business" and "all operations necessary or incidental to a garage business." (Doc. 32-3, p.55). Those allegations potentially fall within the Policy's coverage, and MUSIC owes a defense as a matter of law. Its Motion must be denied on the duty to defend.

### 1.1. *HARTFORD* DOES NOT PERMIT MUSIC TO DISREGARD THE COMPLAINT'S FACTUAL ALLEGATIONS

MUSIC relies on *Hartford* for a narrow rule: when a complaint's factual allegations are irreconcilable with a coverage-triggering legal label, the facts control. 928 So. 2d at 1011-13. There, the complaint alleged deliberate conduct but appended a negligence count. Because the alleged facts "flatly contradict[ed]" negligence, that claim "merely dangle[d] as a cause of action . . . unrelated to any asserted facts." *Id.* The court therefore looked past the label and applied the pleaded facts. *Id.*

That is not this case here. The Operative Complaint alleges that Mobile Fleet leased and controlled the premises for its heavy-truck-repair garage business and was maintaining and improving that location when Joshua fell. (Doc.32-6, p.2-3 [¶¶5, 8-9]). Those are factual allegations. And those factual allegations fit the Policy's definition of "garage operations," which includes the ownership,

maintenance, and use of locations for the garage business and operations necessary or incidental to that business.

MUSIC cannot use *Hartford* to discard those facts and replace them with its own labels of "construction" or "landscaping" do relieve itself of the duty to defend. Because the Operative Complaint itself alleges facts within the Policy's coverage, the duty to defend is triggered. MUSIC may not use extrinsic evidence to "disestablish" that duty. *Tanner*, 874 So. 2d at 1064-65.

The record also confirms the pleaded business nexus. Mobile Fleet's lease restricted the premises to use as a fleet-management shop, truck-service-and-repair facility, and truck wash. Osborn testified that the property's principal business purpose was diesel-truck repair and that Mobile Fleet stored equipment from its other shops there before the accident. (Doc.37-2, p.6, 42-43 [21:8-23:7; 168:17-169:14]). Mobile Fleet's discovery responses tie Jon's tree work to trees interfering with the warehouse roof and to planned roof and skylight repairs. (Doc. 32-7, p.7-10 [ROG 11, 14]).

The pre-loss insurance history points the same way. In February 2022, Greenhalgh requested that 3100 be added as "Location 3" to Mobile Fleet's predecessor garage policy while stating, "No sales at this location yet." Century thereafter endorsed the policy to add 3100 under "LOCATIONS WHERE YOU CONDUCT GARAGE OPERATIONS." That evidence does not rewrite MUSIC's

Policy—it shows that the Operative Complaint's description of 3100 as a garage-business location was not invented for this coverage dispute.

### 1.2 MUSIC Cannot Use Extrinsic Evidence to Defeat a Defense the Operative Complaint Already Triggers

MUSIC relies on Mobile Fleet's discovery response that it had not completed its move and expected day-to-day operations to begin after the tree and roof work. Alabama law forecloses that argument. Alabama has "never held that, even though the allegations of a complaint do allege a covered accident or occurrence, the courts may consider evidence outside the allegations to disestablish the duty to defend." *Tanner*, 874 So. 2d at 1064-65; *see Hartford*, 928 So. 2d at 1010-11. Extrinsic evidence may establish a defense obligation when the complaint is silent or uncertain. It cannot erase one that the complaint already creates.

*Cypress Insurance Co. v. Foley,* 2025 WL 1758627, at *2–3 (N.D. Ala. June 25, 2025), applied that rule at summary judgment. The insurer sought to contradict a coverage-triggering allegation with discovery evidence. The court refused: "where the allegations in the underlying complaint would, if true, establish a duty to defend, the court may not consider evidence outside the pleading." *Id.*

MUSIC asks this Court to do the same thing. The Operative Complaint alleges present control and use of 3100 for Mobile Fleet's heavy-truck-repair business and maintenance and improvement of that location. MUSIC cannot

convert those allegations into an uncovered construction project through contrary discovery evidence.

Nor would that evidence establish MUSIC's position even if considered. "Had not completed its move" does not mean "was not maintaining or using the location for its business." Mobile Fleet had leased the premises exclusively for truck service and repair, stored equipment from its operating shops there, and described its use as "for garage operations in the intent for our business." (Doc.37-2, p.42-43 [168:17-169:14]). MUSIC may litigate what the facts ultimately establish when indemnity is ripe, but it cannot use disputed extrinsic facts to eliminate a defense triggered by the Operative Complaint.

### 2. MUSIC IS NOT ENTITLED TO SUMMARY JUDGMENT ON INDEMNITY

#### 2.1 THE FACTS NECESSARY TO DETERMINE INDEMNITY REMAIN UNRESOLVED

"[O]ften a court can only determine whether there is coverage under the insurance policy, and thus a duty to indemnify, based on facts adduced at the trial of the underlying action." *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1252 (11th Cir. 2022). Until liability is imposed, there may be nothing to indemnify. *Id.* The wrongful-death action remains pending. No factfinder has determined whether Mobile Fleet is liable, what conduct establishes any liability, or whether that liability arose from covered garage operations.

The limited, narrow exception in *Snell v. United Specialty Insurance Co.*, 102 F.4th 1208 (11th Cir. 2024), does not change that result. *Snell* permits early adjudication of indemnity where the coverage question can be resolved without waiting for disputed liability facts. There, the insured's own application expressly disclaimed the type of work that produced the underlying claim.

Here, however, MUSIC's no-indemnity theory depends on facts still being litigated: the nature and purpose of the work, Mobile Fleet's operations at the premises, the parties' relationships, their respective control, and the basis of any eventual liability. Those questions cannot be resolved by the insurance application alone. The ordinary rule applies. Indemnity should await the facts that will determine whether any liability imposed on Mobile Fleet falls within the Policy. *James River*, 22 F.4th at 1252; *see also Pharmacists Mut. Ins. v. Godbee Med. Distributors, Inc.,* 733 F. Supp. 2d 1281 (M.D. Ala. 2010); *Pennsylvania Nat'l Mut. Cas. Ins. v. Hethcoat & Davis, Inc.,* 339 F. Supp. 3d 1248 (N.D. Ala. 2017); *Sphere Drake Ins., P.L.C. v. Shoney's, Inc.,* 923 F. Supp. 1481 (M.D. Ala. 1996).

### 2.2 THIS COURT SHOULD NOT DECIDE JOSHUA'S DISPUTED RELATIONSHIP WITH JON'S THROUGH A COVERAGE RULING

One unresolved merits issue requires particular care: Joshua Westmoreland's relationship with JTS. Joshua Westmoreland's legal relationship with Jon's Tree Service remains disputed in the underlying action. Westmoreland does not ask this Court to find that Joshua was an employee, an independent contractor, or neither.

The record proves the dispute, not its answer (and nothing in this brief concedes any of those positions).

Nor does this Court need to choose among those positions. *Colony Insurance Co. v. Carter*, 2011 WL 13229390 (N.D. Ala. Sept. 30, 2011), declined to decide whether an injured worker was an employee or independent contractor while that same issue remained unresolved in the underlying state action:

> This court agrees that all issues relating to the merits or substance of the Carters' underlying claims should be addressed in the first instance by the state court presiding over those claims. This court is not persuaded to deviate from that procedure because of the parties' apparent "preference" for litigating those issues here. The parties' preferences do not control this court's docket. Stated differently, **it is not for this court to decide whether Danny Carter was an independent contractor or an employee**, whether he elected an exclusive remedy by accepting a workers' compensation settlement from Graham Logging's insurance carrier, or whether Mr. Carter was a third-party beneficiary to the contract between Graham Logging and International Paper Company.
>
> In fact, Eleventh Circuit precedent suggests that **it would be *wrong* for this court to decide legal issues in a federal declaratory judgment action**, when those same issues have been raised but not yet decided in a parallel state court proceeding.

*Colony Ins.*, 2011 WL 13229390, at *12 (bold emphasis added).

*English v. Alfa Mutual Insurance Co.*, 554 So. 2d 1021 (Ala. 1989), is even more direct. There, the Alabama Supreme Court reversed a coverage declaration that turned on the same employee-status issue pending in the underlying negligence case, warning against using declaratory relief as "a vehicle to determine the sufficiency of defenses to a pending action." *Id.* And, as referenced above, the

Eleventh Circuit treats factual overlap with pending liability litigation as significant, particularly where the state court is better positioned to resolve those facts. *Nat'l Tr. Ins. Co. v. S. Heating & Cooling*, 12 F.4th 1278, 1285-86 (11th Cir. 2021); *Ameritas Variable Life Ins. v. Roach*, 411 F.3d 1328, 1331 (11th Cir. 2005).

There is also no need to reach Joshua's status. MUSIC moved on the scope of "garage operations" and, alternatively, rescission under Ala. Code § 27-14-7(a)(2). Neither requires this Court to classify Joshua's relationship with JTS. The Court should leave that merits issue where it belongs.

### 2.3 THE INDEMNITY CLAIM SHOULD BE DISMISSED WITHOUT PREJUDICE OR STAYED

MUSIC is not entitled to a present declaration that it can never owe indemnity. When a declaratory judgment action contains both a ripe duty-to-defend claim and an unripe duty-to-indemnify claim, recent decisions from this District have dismissed premature indemnity claims without prejudice where underlying liability had not been established. *EMCASCO Ins. Co. v. C.A.T. Contracting LLC*, 2024 WL 4683655 (N.D. Ala. Nov. 5, 2024); *Cypress Ins.*, *supra*, 2025 WL 1758627. Other courts have stayed the indemnity claim rather while resolving a ripe duty-to-defend issue. *Accident Ins. Co. v. Greg Kennedy Builder, Inc.*, 159 F. Supp. 3d 1285 (S.D. Ala. 2016). The Court should dismiss MUSIC's indemnity claim without prejudice or, alternatively, stay it until the underlying action fixes the facts on which indemnification depends.

### 3. "Heavy Truck Repair" Identifies the Insured Garage Business; It Does Not Delete Coverage for Maintaining and Using That Business's Location

MUSIC isolates the Schedule of Operations and uses it to rewrite the Policy's definition of "garage operations." The Schedule states that "Garage Operations" includes "ONLY" Class Code 1929, "Heavy Truck Repair," and excludes bodily injury arising from unlisted operations, activities, or events. MUSIC reads that language as requiring that every individual task itself constitutes the physical repair of a truck. The Policy does not say that.

Alabama requires "[e]very insurance contract" to be construed according to "the entirety of its terms and conditions." Ala. Code § 27-14-17(a). Each provision must be read "in context with all other provisions." *Cowart v. GEICO Cas. Co.*, 296 So. 3d 266, 270 (Ala. 2019). An endorsement supersedes printed terms only where the provisions *actually* conflict. *Commercial Standard Ins. Co. v. General Trucking Co.*, 423 So. 2d 168, 170 (Ala. 1982); *Ross Neely Sys., Inc. v. Occidental Fire & Cas. Co.*, 196 F.3d 1347, 1354 (11th Cir. 1999).

Read as a whole, the Policy is straightforward. The Garage Coverage Form defines "garage operations" to include "the ownership, maintenance or use of locations for garage business" and "all operations necessary or incidental to a garage business." (Doc. 32-3, p.55). The Schedule identifies the insured garage business: Heavy Truck Repair. The Coverage Form defines the operations of that business. The provisions complement each other. They do not conflict.

"Heavy Truck Repair" does not say that coverage exists only while a mechanic is physically repairing a truck. It does not exclude maintenance of the premises. It does not delete the "ownership, maintenance or use" of garage-business locations. And it does not eliminate operations "necessary or incidental" to the garage business. *See Kinnon v. Universal Underwriters Ins. Co.*, 418 So. 2d 887, 890–91 (Ala. 1982) ("The root word 'operate,' when used in the context of garage operations, refers to business operations"); *see also Snell*, 102 F.4th at 1215-16 (explaining that specified-operations language "describes the contours or boundaries of coverage" but does not automatically function as an exclusion taking away coverage granted elsewhere).

MUSIC's reading would strip the location language of meaningful effect. Under its theory, maintaining the roof of a truck-repair facility, moving shop equipment into it, servicing its building systems, or performing work necessary to place the facility into operation would fall outside "garage operations" because those specific, particular tasks are not themselves actual truck repair. Yet the Policy expressly includes maintenance and use of garage-business locations and necessary or incidental operations. MUSIC's interpretation is not a whole-policy reading. It is a deletion.

Further, the record independently supports a covered business nexus. Even apart from the Operative Complaint, MUSIC cannot establish that the work was categorically unrelated to Mobile Fleet's heavy-truck-repair business. Mobile Fleet

leased 3100 for one permitted use: a "Fleet Management Shop" operating as "Mobile Fleet Specialists, Truck Service and Repair and Truck Wash," "and for no other or different use or purpose." The lease also imposed maintenance and repair obligations on Mobile Fleet.

The business connection was concrete. Mobile Fleet selected the property for truck flow, parking, an onsite truck wash, and diesel-truck repair. The completed facility contained five diesel-repair bays. (Doc.37-2, p.6 [21:8–23:7]). Before the buildout was complete, Mobile Fleet stored equipment from its operating shops there. Osborn described that use as "for garage operations in the intent for our business." (*Id.*, p.42-43 [168:17-169:14]).

The tree work was tied to the building. Mobile Fleet evaluated roof and skylight work at the property. Its discovery responses state that trees were growing through broken skylights and onto the roof and that JTS was retained to remove the trees before planned roof and skylight repairs. (Doc. 32-7, p.7-10); *see also* (Doc.37-2, p.9, 17 [36:3-23, 67:1-20]). A reasonable factfinder could conclude that removing trees interfering with the roof of a leased truck-repair facility before repairing that roof constituted maintenance of the location or an operation necessary or incidental to the scheduled garage business. MUSIC responds by calling the work "construction" or "landscaping." Those labels do not answer the Policy question. The relevant inquiry is how the activity related to the scheduled

garage business—not which trade label can be attached to the immediate task. At minimum, the record precludes summary judgment.

#### 4. MUSIC Has Not Established Materiality Under Ala. Code § 27-14-7(a)(2)

MUSIC proves only that 3100 was omitted from the application. Ala. Code § 27-14-7(a)(2) requires more: the omission must be "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer." Materiality is "almost invariably a question for the jury." *First Fin. Ins. Co. v. Tillery*, 626 So. 2d 1252, 1255 (Ala. 1993). Even uncontradicted underwriter testimony is "not necessarily dispositive." *Bennett v. Mut. of Omaha Ins. Co.*, 976 F.2d 659, 661 (11th Cir. 1992).

MUSIC offers no underwriting testimony, guideline, rating analysis, or other evidence showing that disclosure of 3100 would have changed its acceptance of the risk or the hazard assumed. Its proof establishes omission, not materiality. The application does not supply the missing proof. It asks for "Locations" and "Operations at Location," but does not expressly address leased but unopened premises or locations being prepared for operations.

The contemporaneous insurance record cuts the other way. Months before the loss, Greenhalgh asked that 3100 be added as "Location 3" to Mobile Fleet's predecessor garage policy and stated, "No sales at this location yet." Century then added 3100 under "LOCATIONS WHERE YOU CONDUCT GARAGE

OPERATIONS." That history does not bind MUSIC. It does show why materiality cannot be presumed from the omission alone.

*Allied World Surplus Lines Insurance Co. v. Lovette Properties, LLC*, 2024 WL 1142257 (N.D. Ala. Mar. 15, 2024), reached the same point: materiality under subsection (a)(2) presented a factual issue. MUSIC has not carried its burden.[4] *Id.* (denying summary judgment under subsection (a)(2) because materiality presented a factual issue, even though the insurer separately prevailed under subsection (a)(3)). Summary judgment on rescission should be denied.

## E. CONCLUSION

Based on the foregoing, MUSIC's motion is due to be denied. MUSIC has not established the absence of a duty to defend or the right to rescind the Policy, and the Court should stay or dismiss without prejudice the indemnity claim.

Respectfully submitted,

*/s/W. Ryan Myers*
**KEITH T. BELT, JR. (ASB-6843-T79K)**
**W. RYAN MYERS (ASB-1040-A16P)**
Attorneys for Plaintiff

[4] MUSIC bears the burden of affirmatively establishing every essential element on which it seeks judgment, including materiality under Section 27-14-7(a)(2). "When the moving party has the burden of proof at trial," it must "show affirmatively the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).

OF COUNSEL:
**BELT, BRUNER & BARNETT, P.C.**
880 Montclair Road, Suite 300
Birmingham, AL 35213
Phone: (205) 933-1500
Fax: (205) 933-5500
E-Mail: keithb@beltlawfirm.com
ryanm@beltlawfirm.com

## CERTIFICATE OF SERVICE

I do hereby certify that on August 10, 2026, I electronically filed the foregoing with the Clerk of the Court, using the PACER/ECM system which will send notification of such filing to the following registered persons and that those persons not registered with the PACER/ECM system were served by placing a copy of same in the United States Mail, First Class Postage Prepaid, to:

**MESA UNDERWRITERS SPECIALTY INS. CO.**
Kenneth W. Boyles, Jr., Esq.
Maggie Arellano, Esq.
Anderson Blackmon, Esq.
PHELPS DUNBAR LLP
2025 3rd Avenue North, Suite 1000
Birmingham, AL 35203
P.: 205-716-5200
F.: 205-716-5389
E.: Kenneth.Boyles@phelps.com
E.: Maggie.Arellano@phelps.com
E.: Anderson.blackmon@phelps.com

**MOBILE FLEET SPECIALISTS**
Robert R. Riley, Jr., Esq.
James E. Murrill, Jr., Esq.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, Alabama 35209
E: rob@rileyjacksonlaw.com
E.: jay@rileyjacksonlaw.com

*/s/W. Ryan Myers*

OF COUNSEL